**FILED**
January 29, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____Julie Golden_____
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CSTMR, LLC, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Civil Action No. 1:23-CV-1306 |
| LIBERTY SBF, LP | § § § | |
| *Defendant*. | § | |

### FINAL JUDGMENT CONFIRMING FINAL ARBITRATION AWARD

On January 28, 2024, came on to be heard CSTMR, LLC's Petition and Motion to Confirm Arbitration Award and Notice of Application for Order to Confirm Arbitration Award (the Petition). Respondent Liberty SBF, LP has filed a response indicating that it is not opposed to CSTMR, LLC's petition.

The Court, having examined the Petition, including the Final Order and Award entered September 25, 2023, a true and correct copy of which is attached hereto as Exhibit 1, along with pleadings, evidence, arguments of counsel, and authorities submitted by the parties in support of the Motion and Application, finds that Petition to Confirm Arbitration Award and Notice of Application for Order to Confirm Arbitration Award should be, and hereby is, GRANTED.

Accordingly, it is ORDERED, ADJUDGED, and DECREED that the Final Arbitration Award, attached hereto as Exhibit 1, is CONFIRMED and shall hereafter be considered and enforced as a final judgment of this Court. All monetary relief and non-monetary relief awarded in the Final Award is hereby incorporated by reference and considered to be the final judgment of this Court.

IT IS FURTHER ORDERED that this judgment shall bear post-judgment interest at the rate equal to the weekly average 1-year constant maturity Treasury yield as published by the Board of Governors of the Federal Reserve System for the calendar week preceding this judgment, compounded annually, from the date of this judgment until paid. 28 U.S.C. § 1961. All relief not expressly granted herein is denied.

Signed and entered on this 29th day of January, 2024.

_____
ROBERT PITMAN
U.S. DISTRICT JUDGE

| | |
|---|---|
| **IN THE MATTER OF THE** § | |
| **ARBITRATION BETWEEN** § | |
| § | |
| **CSTMR, L.L.C.,** § | |
| § | |
| *Claimant/Counter-Respondent,* § | |
| § | |
| v. § | **Case No. 2023-1** |
| § | |
| **LIBERTY SBF, L.P.,** § | |
| § | |
| *Respondent/Counter-Claimant* § | |

## FINAL ORDER AND AWARD

In the matter of the arbitration between CSTMR, L.L.C. ("CSTMR" or "Claimant") and Liberty SBF, L.P. ("Liberty" or "Respondent"), privately arbitrated utilizing the rules of the American Arbitration Association (AAA), the undersigned arbitrator, having been agreed upon by the parties, duly appointed, and having considered the evidence and arguments presented by both parties in a Final Hearing held on July 10-14th, 2023 hereby renders the following award and sets forth brief reasoning in support thereof.

**Background**

The parties are familiar with the background of the case, thus this award will recount background only as necessary to the legal and factual findings herein.

Respondent Liberty is a commercial real estate lender. Although Liberty's core business had been commercial real estate loans, during the COVID-19

pandemic Liberty expanded its offerings to include certain new Small Business Administration loan products authorized by Congress under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which, among other things, established the Paycheck Protection Program ("PPP").

Claimant CSTMR, LLC. is a digital marketing agency which does business in the financial services sector. In late 2020-early 2021, when Liberty planned to launch its campaign to initiate and administer loans under the PPP, Liberty sought the assistance of CSTMR to run a paid media campaign (the "program") targeting small business owners to obtain PPP loans from Liberty.

The parties entered into two agreements on or about January 5th of 2021 - a Master Services Agreement (MSA) and a Scope of Work (SOW) agreement (collectively "the agreements" or "the contracts"). The parties' agreements envisioned Liberty doing a digital ad campaign through CSTMR with a minimum monthly spend of $50,000, with the parties anticipating a total spend in the range of $250,000 to $500,000. The campaign ended up being exponentially larger, as Liberty and its CEO, Alex Cohen, rapidly increased the ad spend as the program successfully generated PPP loan applications, ultimately spending $18 to $20 Million over the 5-month life of the program. In the last days of the campaign, the program involved daily spending higher than the amount initially envisioned for the life of the program, up to $750,000 a day on digital ads across a number of platforms.

On conclusion of the program, the parties found themselves in conflict over a number of issues. On December 17, 2021, CSTMR initiated this arbitration against Liberty asserting breach of contract for Liberty's failure to pay invoices from March, April, and May of 2021 in the amount of $1,010,043.00. Liberty

counterclaimed, asserting that CSTMR fraudulently induced them into entering the contracts and that CSTMR breached the contract in various ways.

The parties conducted discovery, and on July 10-14, 2023, held a final hearing in this matter. The format for the final hearing was agreed upon by counsel for both parties. Specifically, on July 10 and 11, the parties presented opening arguments and live examinations of two fact witnesses, CSTMR CEO Rory Holland and Liberty representative Courtney Finello. The arbitrator also heard remote testimony via Zoom from Liberty's retained expert, Jonathon Hochman. On July 11-13, the undersigned arbitrator viewed the parties' designated portions of the videotaped deposition testimonies of Alex Cohen, Kevin Kaye, Ben Ronnenberg, and Laura Carr. On July 12, 2023, the parties presented closing arguments. The parties were then given the opportunity to file post-hearing briefing and proposals for the arbitration award.

## Arbitrator's Findings and Award

**Brief Summary**

Having heard and considered the evidence and arguments of counsel in this matter, I hereby find the parties entered into valid and enforceable contracts, specifically the Master Services Agreement (MSA) and Statement of Work (SOW). Claimant CSTMR has by a preponderance of the evidence established its claim for breach of contract by Liberty for failure to pay certain invoices, thus entitling it to an award as set forth below. I further find that the preponderance of the evidence does not support Liberty's counterclaims/defenses based upon fraudulent inducement and breach of contract, but that CSTMR is entitled to an

offset for $248,417.00 for monies deposited with CSTMR to pay for ads which were not exhausted prior to the conclusion of the program.

**Award**

With regard to CSTMR'S claim for breach of contract, the evidence established the following:

1. The parties entered into valid and enforceable contracts, specifically the Master Services Agreement (MSA) and Statement of Work (SOW).

2. There were three invoices due to CSTMR left unpaid by Liberty: #1013, dated March 31, 2021, in the amount of $632,876.00; #1033, dated April 30, 2021, in the amount of $317,716.00; and #1060, dated May 31, 2021, in the amount of $59,451.00. The unpaid invoices total $1,010,043.00.

3. Liberty failed to pay each of the invoices listed above. Liberty did not argue or present evidence that it had made such payments or that the invoices were not accurate. Liberty representative Courtney Finello testified that the invoices appeared to be in order. The charges on the invoices set forth herein accurately reflect the amounts due.

4. By way of counterclaim and defense, Liberty alleged that CSTMR fraudulently induced it into entering the agreements and that CSTMR breached the contract. Liberty has failed to prove these claims by a preponderance of the evidence, and they are hereby DISMISSED WITH PREJUDICE.

5. Under the parties' agreements, invoices were due and payable in 30 days, after which due date interest accrued at a rate of 1.5% simple interest per outstanding month. The interest due on each unpaid invoice is properly calculated as follows: Invoice Amount x 1.5% x Number of Months Past Due = Interest Owed by Liberty. The total interest accumulated on the three missed payments as of the July 10, 2023 date of the final hearing was $387,367.50.

6. Liberty's failure to pay these invoices breached Liberty's duties to CSTMR under the Agreements. As a result of this breach, Liberty owes CSTMR $1,397,410.50 in unpaid invoices ($1,010,043.00 plus $387,367.50, representing interest at a rate of 1.5% per month through the date of final hearing). The following chart submitted by CSTMR accurately breaks down the principal and interest due:

| Invoice # | Amount        | Date       | Months Delinquent | Interest Owed |
|-----------|---------------|------------|-------------------|---------------|
| 1013      | $632,876.00   | 03/31/2021 | 26                | $246,821.64   |
| 1033      | $317,716.00   | 04/30/2021 | 25                | $119,143.50   |
| 1060      | $59,451.00    | 05/31/2021 | 24                | $21,402.36    |
| TOTAL     | $1,010,043.00 |            |                   | $387,367.50   |

7. The parties' MSA further provides that the prevailing party in any action to enforce the contract is entitled to recover its attorneys' fees, costs, and expenses. As such, Liberty is hereby ordered to pay CSTMR $110,202.50 in attorneys' fees, which were proven up during the final hearing and found to be reasonable and necessary. As a further result of this breach, Liberty

owes and is hereby ordered to pay CSTMR $19,384.80 in costs and expenses ($9,634.80 at time of final hearing plus $9,750 final arbitration cost), which are also found to be reasonable and necessary.

8. Because the testimony established that CSTMR currently holds $248,417.00 in monies that Liberty deposited with CSTMR for ad buys that were not executed prior to the conclusion of Liberty's PPP marketing efforts, Liberty is entitled to a credit for that amount.

9. In summary, Liberty breached the agreements and is hereby ordered to pay CSTMR principal and interest of $1,397,410.50 plus attorneys' fees and expenses of $129,587.30, less an offset for unspent ad monies of $248,417.00.  Liberty is hereby ordered to pay this total - $1,278,580.80 - within 30 calendar days of the date of this order.

## Reasoning in Support of Award

The undersigned arbitrator bases the above award on the following findings and conclusions as to the parties' claims and counterclaims:

### I.   CSTMR Established a Breach of Contract Based on Liberty's Failure to Pay

The parties entered valid and enforceable contracts, specifically the Master Services Agreement (MSA) and Statement of Work (SOW).  As set forth above, CSTMR established in the final hearing that the three invoices at issue were accurate; that the invoices were due and owing and have not been paid by

Liberty; that the parties' agreements provided for simple interest at 1.5% on past due amounts; and that the agreements provided that the non-prevailing party shall pay attorneys' fees and costs to the prevailing party. Further, CSTMR's damages were of the type permitted by the parties' MSA, which provides for damages for amounts due under the contract but prohibits consequential and other types of damages. CSTMR established by a preponderance of the evidence a prima facie case for CSTMR's claims for breach of contract and the damages described above.

## II.     Liberty's Counterclaim for Fraudulent Inducement Was Not Established by the Evidence

By way of counterclaim and defense, Liberty alleged that CSTMR fraudulently induced it into entering the agreements.  As the basis for its fraudulent inducement claim, Liberty asserts that CSTMR falsely provided assurances that it "had the skills, expertise, resources, and bandwidth available to meet Liberty's needs" with respect to the PPP campaign. Liberty has failed to prove by a preponderance of the evidence that CSTMR fraudulently induced Liberty into entering into the Agreements.

To prove a claim for fraudulent inducement, Liberty needed to prove the following elements:
   a. That the parties entered into a binding contract;
   b. That CSTMR made a material false statement of fact prior to the execution of the contract;
   c. That Liberty justifiably relied upon the false statement in entering into the contract;
   d. That Liberty suffered damages as a result of the contract.

*Haase v. Glazner*, 62 S.W.3d 795, 797-98 (Tex. 2001); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990).

Liberty failed to provide evidence sufficient to meet their burden that CSTMR made a materially false statement, prior to execution of the contract, or that it relied on such a statement to its detriment. Liberty's counterclaim points to statements by CSTMR that "it could meet each of Liberty's advertising needs," and that "it had the expertise and resources necessary to execute Liberty's PPP project." These statements are vague - so non-specific as to not be actionable. Further, any statement must be considered as of the time it was made. At the outset of the agreements, what did CSTMR understand to be "Liberty's advertising needs" and the scope of "Liberty's PPP project Liberty's PPP project?" The evidence established that Liberty told CSTMR before the Agreements were executed that Liberty expected to spend $550,000 in a calendar quarter, and perhaps less. The campaign ended up being exponentially larger than envisioned at the time of the parties' contract, as Liberty and its CEO, Alex Cohen, rapidly increased the ad spend under the program, ultimately spending $18 to $20 Million over the 5-month life of the program. The preponderance of the evidence does not establish that CSTMR misrepresented its expertise or capacity to meet Liberty's advertising needs and execute the PPP project as the parties envisioned at the relevant time, ie. the inception of the contract. Further, Liberty did not prove by a preponderance of the evidence that those statements, if actionable, were false - Liberty CEO Alex Cohen continually increased his investment in the program and representative Courtney Finello testified that CSTMR met the targets set by Liberty for cost per loan throughout the program.

Cohen testified in his deposition to another alleged false statement - that CSTMR had represented they were going to be able to "get into the guts of our portal and be able to set up what they needed to set up in order to optimize applications going into that portal." This statement is vague and does not specify a representation that CSTMR would provide the "bottom of funnel" integrated analytics claimed to be a breach by Liberty. Moreover, the statement was not proven to be false given the other analytics and coordination – landing pages, application portals, etc. – between CSTMR's advertising program and Liberty's systems. See further discussion below in breach of contract section.

Consequently, the evidence failed to establish a materially false statement by CSTMR prior to the execution of the Agreements. Since Liberty failed to establish a materially false statement, it necessarily failed to establish reasonable reliance on a false statement or damages therefrom. As such, Liberty's counterclaim for fraudulent inducement fails, the claim is DISMISSED WITH PREJUDICE, and Liberty is not entitled to receive any payment or offset from the award based on this counterclaim.

### III. Liberty's Counterclaim for Breach of Contract Was Not Established by the Evidence

Liberty further counterclaims that CSTMR breached the parties' contracts in various ways. The evidence established that the parties entered into valid and enforceable contracts. To prove its breach of contract claim, Liberty had to prove by a preponderance of the evidence that CSTMR breached the contract and that Liberty suffered legally recoverable damages as a result of those breaches. It has failed to do so.

Through the course of litigation, Liberty asserted various complaints with regard to CSTMR's performance under the contract, ranging from inadequate staffing to criticisms of CSTMR's tracking and analysis (specifically that CSTMR never integrated its program with Liberty's system to timely track each funded loan back to the specific platform and ad that attracted the initial application).

### A. Staffing as a basis for breach of contract?

With regard to staffing, the evidence showed that the program rapidly ramped up beyond initial projections, varied widely in volume through its several months' lifespan, and was shut down in April with short notice from Liberty's CEO. While the parties acknowledged challenges at times in staffing to keep up with the rapid volume of the program, Liberty's evidence did not prove that any staffing issue rose to the level of constituting a breach of contract or caused Liberty any specific compensable damage. Evidence showed the staffing was consistent with that proposed in the Addendum to the SOW, and the evidence did not establish that CSTMR's staffing fell below commercially reasonable standards and practices for similar services.  Further, Liberty did not tie any specific damages to their complaints relating to CSTMR's staffing of the program.  As such, the staffing issues of which Liberty complains are not sufficient to support a claim for breach of contract.

### B. Inadequate tracking and analysis as a basis for breach of contract?

At the time of the final hearing in this matter, Liberty acknowledged that its breach of contract allegations centered on whether CSTMR performed adequate attribution tracking to timely link actual funded loans back to the ad platforms and specific ads from which their applications were generated.  Specifically, Liberty's

expert Jonathon Hochman opined that CSTMR breached the contract by "failing to provide 'bottom-of-funnel' conversion metrics, which prevented Liberty from understanding in a timely manner whether the online advertising managed by CSTMR for Liberty was efficient or wasteful." More specifically, while Hochman's report acknowledged that "CSTMR set up tracking codes in the ads and on Liberty's website," he was critical "that CSTMR failed to set up tracking integration with Liberty's customer relationship management (CRM) system, SalesForce. This is why I say that CSTMR failed to set up bottom-of-funnel conversion tracking."

As such, Liberty's breach of contract claim turns on the question - Did CSTMR have an obligation, whether by contract or industry standards, to perform "bottom of funnel" attribution tracking beyond the information it provided, or attribution integrated with Liberty's internal system, Salesforce or otherwise? The undersigned arbitrator answers this question in the negative. First, the evidence on final hearing failed to establish that the specific "bottom of funnel" tracking subject of Liberty's complaints was a requirement under the express language of the parties' contract. Second, Liberty failed to show that this level of tracking was an industry standard that constituted a breach under the contract, which provided that CSTMR would perform the work in a "professional and workmanlike manner in accordance with commercially reasonable standards and practices for similar services."

1. **Liberty did not establish that bottom of funnel tracking was required by the express language in the parties' MSA and SOW**

First, we look to the express language of the contracts governing the parties' relationship. The MSA and SOW make no reference to "bottom of funnel" tracking, but rather speak of CSTMR's duty to provide analytics in more general terms.

Notably, "tracking" is not defined in the Agreements. Section 1.1 of the MSA provides that "CSTMR will provide the Services and Deliverables in a professional and workmanlike manner in accordance with commercially reasonable standards and practices for similar services." The MSA goes on to say that "in no event will CSTMR be obligated to perform any services beyond the specifications of the Services and Deliverables expressly agreed upon in any applicable SOW. "

CSTMR's obligations are defined in the Scope of Work, in which CSTMR agreed to provide:

- Paid media* - planning, buying, reporting, and optimization (ex: Google Ads, Display, Facebook, retargeting)
- Ongoing campaign testing, tracking, reporting, and analysis
- Regular reporting with insights and performance recommendations (weekly, bi-weekly, or monthly reporting depending on campaign velocity)".

Liberty also argues to expand CSTMR's obligations by adding representations from CSTMR's website pitch materials, which advertised "[c]onversion, testing & optimization (funnels – landing pages . . . etc.)"; "[o]ngoing testing & optimization," including "funnel testing"; "test[ing] & optimi[zing] campaigns"; preparing "[c]onversion strategy"; "optimi[zing] strategy based on learnings"; "optimi[zing] buyer journey, ideal customer profile & sales funnel"; "testing & optimizing"; and "boost[ing] customer conversions and increas[ing] ROI."

On this record, neither the MSA, SOW, or even CSTMR's outside marketing materials place the duty on CSTMR to provide the type of integrated bottom of funnel tracking on which Liberty bases its breach of contract claim. This conclusion is consistent not only with the language of the contracts, but also the testimony of

the party representatives on final hearing. Liberty's Courtney Finello testified that the parties never had any pre-contract discussions on getting funded loan data from Liberty's Salesforce system. She also testified that Liberty didn't have set metrics at the outset of the program "because it was going to be so fast." Likewise, CSTMR CEO Rory Holland testified that there was no discussion at the inception of the contract about CSTMR using Salesforce to do bottom of funnel tracking.

As such, Liberty did not establish that bottom of funnel tracking was required by the express language in the parties' MSA and SOW, or that CSTMR breached the express language of the contract by failing to provide the level integrated tracking of which Liberty complains.

## 2. **Liberty did not establish that the lack of bottom of funnel tracking amounts to a breach of contract based on industry standards**

Liberty also asserts that the lack of bottom of funnel tracking breached the contract's requirement that CSTMR perform the services in a "professional and workmanlike manner in accordance with commercially reasonable standards and practices for similar services." Liberty attempted to establish this link between bottom of funnel tracking and the "commercially reasonable" standard through its retained expert Jonathan Hochman. Hochman opined that industry standards require integrated bottom of funnel tracking. However, he could not point to any published or otherwise recognized industry standard in terms of the extent to which a digital marketing company must provide bottom of funnel tracking. And in fact, Hochman testified that the level of "tracking" that is required is dependent in large part upon the particular client and program at issue.

CSTMR CEO Rory Holland likewise testified that that the extent of backend communications vary based on the parties and nature of the particular program. He testified that tracking in fintech marketing generally includes the use of platform-based tools such as Bing, Google and Facebook analytics, and other pixel-tracking applications to track leads generated and applications completed. He testified that tracking actual closed loans (referred to here as bottom of funnel tracking) is more difficult because that data is generally in the clients' hands, not the advertising contractor.  In this instance, CSTMR's ads directed applications to Liberty's landing pages and portal for processing. CSTMR would have to rely on Liberty, which processed the loans and collected the data as to loans actually funded. In this case, Liberty conveyed this information back to CSTMR as a "pull through rate," capturing the percentage of completed applications that actually resulted in funded loans, and the parties used this as a measure of the success of the program. Hochman testified that while integrating the technology into a customer's CRM program, such as Salesforce, would have given more prompt information on closed loan attribution, "there is more than one way to skin a cat." In this case, the parties used the pull through rate and had URL tracking (discussed below) to track which platforms resulted in closed loans, and Liberty has failed to show that CSTMR's performance in this regard failed to meet "commercially reasonable standards and practices for similar services."

3. **Liberty did not establish that CSTMR otherwise breached its obligations to provide analytics and optimization as set forth in the contract**

Even though the contract and industry standard did not specifically require integrated bottom of funnel tracking, they did set forth certain obligations for CSTMR in providing data and reporting to optimize the digital advertising program.

Liberty at final hearing argued that CSTMR's failure to provide tracking left Liberty "flying blind" with regard to making decisions under the advertising program, but the evidence does not support that assertion. Instead, communications throughout the record and testimony of the witnesses (in particular Finello, Liberty's expert Hochman, and Liberty CEO Alex Cohen) make clear that Cohen had a host of data to guide his decisions, including attribution data for closed loans, though not in real time, and that Cohen actively served as the ultimate decisionmaker on platform spending throughout the program. In fact, Liberty's expert Hochman acknowledged that Liberty did have, through CSTMR's URL on each application and other data, the ability to track attribution for closed loans - though not as rapidly as he would like. Hochman testified that the more integrated, "active attribution data" he preferred would have helped protect Cohen from his own mistakes. This does not satisfy Liberty's burden to show CSTMR breached its analytics obligations under the contract.

The final hearing record was replete with evidence of analytics and data provided throughout the program by CSTMR and otherwise available to Liberty with which to gauge the performance of the ad program. The evidence established that CSTMR clearly tracked the performance of the ads to the point of whether leads were generated, and loan applications were completed. Per Finello, Liberty had a variety of data on a daily basis detailing leads, applications completed, loans funded, the fees Liberty earned from those loans, how much was spent on marketing ads and various platforms, and a host of other information. They tracked cost per lead and cost per completed loan application, then applied a pull-through percentage provided by Cohen to reach a cost per funded loan figure. Finello testified that CSTMR was within tolerance on the cost per lead targets set by liberty throughout the project, and that they had regular if not daily communications with CSTMR team about how various platforms were performing.

The focus of Liberty's breach allegation seems to be the argument that CSTMR had a contractual duty to integrate Liberty's Salesforce backend data on funded loans into the analytics of the marketing program – as Hochman said in his testimony, more timely "active attribution date." Hochman acknowledged on cross examination that CSTMR provided Liberty the URL information which would enable Liberty to track the funded loans back to the platforms which generated their applications. Per Hochman's report - "I understand that CSTMR set up tracking codes in the ads and on Liberty's website, but that CSTMR failed to set up tracking integration with Liberty's customer relationship management (CRM) system, SalesForce. This is why I say that CSTMR failed to set up bottom-of-funnel conversion tracking."

The evidence further established that CSTMR actually did provide information to be placed into Liberty's Salesforce system that identified the particular source from which the applicant was referred, but Salesforce rejected the input because it was too long to fit the particular field. Hochman admitted that Liberty had the attribution tracking data to go back for any given funded loan and determine which platform generated the application, and thus whether certain ad platforms were profitable or not. As such, his criticism is narrowed to the active, realtime ability to track attributions for funded loans.

The evidence does not establish that this level of bottom of funnel tracking was an express requirement of the contract, a standard practice in the industry, or even something that was discussed contemporaneous with execution of the contract. And the evidence on final hearing was not clear that this responsibility belonged to CSTMR. Finello testified, and later emails indicated, that CSTMR was going to work with Liberty's technology contractor, Alliancetek, to align the program

with Liberty's application portals and landing pages. But this describes a broad scope of work, including getting the applications into Liberty's system for processing, and not clearly calling for integrated bottom of funnel tracking. Finello testified that there was also some reference to working with Liberty's third-party IT vendor AllianceTek on "adding a piece" so that Liberty could see in real time which funded loans came from which applications and specific ads. However, the evidence presented at final hearing failed to clearly establish who, between CSTMR, Alliancetek, and Liberty, had the duty to tie the "bottom of funnel" funded loan data from Liberty's Salesforce system into the analytics used by the marketing program to achieve the "active, "integrated" bottom of funnel attribution on which Liberty based its breach allegations.

Finello testified that Liberty had access to information on funded loans, including attribution data on those loans. She testified that Alex Cohen used this information to calculate a pull through rate, ie. the percentage of completed applications that ultimately became funded loans, and used this to determine spend levels on advertising. The communications put into evidence show Cohen clearly at the controls of the program on increasing spend, decreasing spend, and stopping spend completely. This further supports CSTMR's assertion it did not breach its duty to provide Liberty with the data to track campaign performance. As such, the evidence does not support a breach of contract finding on the allegation that CSTMR failed to perform its analytics obligations under the contract.

4. **Even if Liberty had established a breach of contract by CSTMR, Liberty's claim for damages falls outside the damages allowable under the terms in the parties' contract requiring notice of breach and prohibiting the type of consequential damages sought by Liberty**

Liberty seeks an offset of $1,543,214 from any amount it may owe under the contract, purportedly representing the direct losses Liberty sustained from media spending it claims it would otherwise not have done between April 4-19th, 2021. Even assuming, *arguendo*, that there was a breach by CSTMR, the terms of the Agreements bar Liberty's claimed damages because Liberty did not follow the notice requirements and because the consequential damages Liberty seeks are excluded under the contract.

## Conclusion

For the reasons stated above, I find that Liberty breached the Agreements with CSTMR by failing to pay and that Liberty's counterclaims in defense have not been established by a preponderance of the evidence. As set forth in the detailed award above, Liberty is hereby ordered to pay $1,278,580.80 within 30 calendar days of the date of this order.

So Ordered this 25th day of September, 2023.

_____
Arbitrator Jeff Rose